# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA : | **CRIMINAL COMPLAINT** |
| v. : | Mag. No. 08-7076 |
| KEITH STEWART, : | |
|    a/k/a "Naughty," | |
| SHEDRICK CRAFTON, : | |
|    a/k/a "Charlie," and | |
| SHAROD HESTER, : | |
|    a/k/a "Rowdy," | |

I, TIMOTHY CAREY, being duly sworn, state the following is true and correct to the best of my knowledge and belief. From in or around November 2007 through in or around January 2008, in the District of New Jersey and elsewhere, defendants KEITH STEWART, a/k/a "Naughty," SHEDRICK CRAFTON, a/k/a "Charlie," and SHAROD HESTER, a/k/a "Rowdy" :

> knowingly and intentionally conspired and agreed with each other and with others to distribute and to possess with intent to distribute, quantities of heroin, a Schedule I controlled substance; cocaine, a Schedule II controlled substance; and a mixture or substance which contains cocaine base, that is crack cocaine, a Schedule II controlled substance contrary to Title 21, United States Code, Section 841(a)(1) and (b)(1)(C).

In violation of Title 21, United States Code, Section 846. I further state that I am a Special Agent of the Department of Homeland Security, Immigration and Customs Enforcement, and that this Complaint is based on the following facts:

SEE ATTACHMENT A

continued on the attached page and made a part hereof.

_____
Timothy Carey, Special Agent
Department of Homeland Security,
Immigration and Customs Enforcement

Sworn to before me and subscribed in my presence,
January 31, 2008, at Newark, New Jersey

_____
Signature of Judicial Officer

HONORABLE MARK FALK
UNITED STATES MAGISTRATE JUDGE

I, Timothy Carey, am a Special Agent with the Department of Homeland Security, Immigration and Customs Enforcement ("ICE"). Based upon my investigation and my discussions with other individuals involved in this investigation, I have knowledge of the following facts:

1. Since in or around November 2007, the communications of defendants KEITH STEWART, a/k/a "Naughty" (hereinafter "STEWART") and SHEDRICK CRAFTON, a/k/a "Charlie" (hereinafter "CRAFTON") were intercepted in accordance with court orders. These intercepted communications indicated that STEWART is the head of a large Newark, New Jersey based narcotics distribution ring that sells significant amounts of heroin, cocaine and crack cocaine. These intercepted communications indicated that STEWART obtained narcotics from numerous coconspirators. In addition, the intercepted communications indicated that STEWART and CRAFTON worked together and supplied narcotics to a number of coconspirators, including defendant SHAROD HESTER, a/k/a "Rowdy" (hereinafter "HESTER").

2. The conversations described below were intercepted pursuant to court orders authorizing the interception of wire communications. The descriptions of the intercepted conversations set forth below are partial, non-verbatim summaries based on descriptions of the conversations prepared by monitors. In these descriptions, comments enclosed in parentheses are based upon my knowledge, training, and experience, the knowledge, training, and experience of other law enforcement agents with whom I have spoken, and the results of the investigation to date. All times ascribed to conversations and other events are approximate.

## STEWART and CO-CONSPIRATOR 1

3. On December 20, 2007, at 5:40 p.m., STEWART called co-conspirator 1 (hereinafter "CC-1") and repeatedly told him that STEWART knew that he owed CC-1 money and that Stewart was waiting for "his people" (his customers) to come through. Stewart also repeatedly complained that an unidentified third party had come at him last night as if he (STEWART) were not going to pay CC-1. Stewart said that he knew how much he had to pay CC-1, and he wasn't going to play any games. STEWART also said that he was going to take care of it, and in the future they were going to deal between CC-1 and STEWART, adding that he did not like dealing with second and third parties. STEWART repeated that somebody owed him (STEWART) money, and assured CC-1 that he knew it was a chain reaction: STEWART had to pay CC-1, and CC-1 had to pay somebody, and it went all the way like that, and STEWART understood that. (Apparently the previous evening someone acting on behalf of CC-1 had tried to collect payment for previously-delivered narcotics, and STEWART resented the implication that he would not honor his debt to CC-1.)

4. On December 28, 2007, at 9:14 p.m., CC-1 called STEWART. During the call, STEWART said that his "guy" was on the road "now" and would be at STEWART's soon. (STEWART was saying that one of his customers was bringing STEWART money at that moment which STEWART was going to provide to CC-1.) CC-1 asked if "he" (STEWART's customer) was going to be there "today" and STEWART said "yes." CC-1 then said that his friend had called him not for the "last thing" CC-1 had taken to STEWART but for the one that he used to take to STEWART. (CC-1 was referring to a specific type of narcotic that CC-1

provided STEWART in the past, not the different type of narcotic that CC-1 was currently providing STEWART.) STEWART asked CC-1 what he was talking about, and CC-1 replied that he was referring to what "Gordy works." (CC-1 was likely referring to heroin, the type of narcotic that defendant GONZALEZ generally sells.) STEWART, clearly understanding what CC-1 was referring to, asked what about "it." CC-1 said that someone had called him and was going to provide him with "that stuff" and then asked STEWART if "we" would be able to move it. (CC-1 was saying that he was going to obtain heroin and he was asking STEWART whether STEWART would be able to sell it.) STEWART said yes but that STEWART had "some" now and that CC-1 would have to give STEWART a good price. (STEWART was saying he currently possessed heroin so CC-1 would have to sell the heroin to him at a low price for him to want to purchase it.) CC-1 agreed. STEWART then told CC-1 that when STEWART called him to come get "that money" (the narcotics proceeds they discussed at the beginning of the call), that CC-1 should bring some "pictures" (samples of the heroin) with him. STEWART also told CC-1 to make sure that "they" were "heavy" because if they were not, "they" would not want "them." Describing what he meant, STEWART said that CC-1 had to make it so when you hold "it" up to the light, you cannot see in "them" and that CC-1 had to "load it up." (STEWART was explaining that when CC-1 packaged the heroin, he had to make sure he put enough heroin in or STEWART's customers would not want to purchase it.) CC-1 agreed.

       5. On December 29, 2007 at 8:23 p.m., STEWART called CC-1 and told him that he had "something" (narcotics proceeds) for CC-1 and asked what time he was going to visit STEWART. CC-1 said it would be later that same night. STEWART then asked if CC-1 was going to bring the "pictures" of the "thing" CC-1 had previously told him about. (STEWART was referring to the samples of heroin they had previously discussed.) CC-1 said he was going to call his friend and would pick "it" up before he went to STEWART's.

       6. On December 29, 2007, at 11:54 p.m., CC-1 called STEWART and told him that he was there (at STEWART's house). STEWART told CC-1 to come in the house.

       7. Based upon physical surveillance, CC-1 was at STEWART's house shortly after the conversation described in the previous paragraph.

### STEWART and CO-CONSPIRATOR 2

       8. On January 2, 2008, at 7:22 p.m., co-conspirator 2 (hereinafter "CC-2") called STEWART and said that "this guy" was around and asked STEWART if he was in his house. (CC-2 was telling STEWART that CC-2's associate was at STEWART's house, and as is made clear in later calls, he was there to pick up narcotics proceeds.) STEWART said that he was not and asked CC-2 to give him approximately 15 minutes. CC-2 agreed.

       9. On January 2, 2008, at 7:57 p.m., CC-2 called STEWART. During the call, STEWART said that he was about to pull up at his house. CC-2 said that "he" (CC-2's associate) was outside.

       10. On January 2, 2008 at 8:26 p.m., STEWART called CC-2 and told him that he had just given CC-2's "man" that "change" and that it was "19,450." (STEWART was saying that he had given CC-2's associate $19,450 in narcotics proceeds.) STEWART also said that CC-2's associate had told STEWART that CC-2 was going to send STEWART some "samples"

(narcotic samples) the next day. CC-2 asked STEWART to repeat what he had said. STEWART said he had given "you" (CC-2) "nineteen, four, fifty." CC-2 said okay and told STEWART that he was going to come see STEWART the next day because he wanted to show STEWART "something" (narcotics). STEWART told CC-2 to make sure it was some "good shit" (high quality narcotics).

## STEWART and CRAFTON

11. On November 16, 2007, at 8:40 a.m., STEWART called CRAFTON and told him to start packing "us" off (STEWART was telling CRAFTON to start packaging narcotics for resale). STEWART further stated that "they" (STEWART's customers) were calling him already (referring to his customers calling to pick up the narcotics).

12. On November 24, 2007, at 5:16 p.m., STEWART called CRAFTON and told him that STEWART had just seen "Saint's cousin" and he needed a "slab" (referring to a large quantity of narcotics that had not been packaged for resale, probably a kilogram or a half kilogram). CRAFTON asked "who," and STEWART reminded him that "Saint's cousin" was the person STEWART had put him on before. (STEWART was stating that he had previously arranged for CRAFTON to sell narcotics to the individual he referred to as Saint's cousin.) Using curse words, STEWART bragged that he was not dealing with "little shit," he was dealing with "slab." When CRAFTON asked where STEWART was, STEWART said he had just come from seeing "him" (referring to the individual who wanted to acquire a large quantity of narcotics) and "they" were going to be calling for the "slab."

13. On November 26, 2007, at 5:25 p.m., STEWART called CRAFTON and asked him how much he had left, explaining that "Saint's cousin" had said that he wanted to see something, but he wanted to see how it operated first. (STEWART was probably saying that the individual he referred to as Saint's cousin wanted to obtain a large amount of narcotics, but wanted a sample first to be sure of its quality.) CRAFTON responded that he did not know how much he had, explaining that he would have to take "it" (referring to the narcotics) out of the "thing" (referring to the container or location at which the narcotics were stored).

14. On November 26, 2007, at 5:28 p.m., CRAFTON called STEWART and reported that it was "like 3 in wrap" (referring to the quantity and packaging of the narcotics in his possession). CRAFTON also referred to a quantity of "powder." STEWART asked whether CRAFTON only had "3 in wrap" and whether the rest of it was put together. CRAFTON said yes, referred to the powder, and added that that was what he had.

15. On January 23, 2008, at 9:36 p.m., STEWART called CRAFTON. During the call, CRAFTON explained that he had been followed by law enforcement officials when he was driving earlier that day. (Law enforcement officials were in fact following CRAFTON at the time he believed he was being followed). CRAFTON asked STEWART why "they" (law enforcement) did not "get" (arrest) him. STEWART said that "they" might have him "under investigation." CRAFTON again asked STEWART why if they were following him they had not "taken" him. STEWART said that they did not have to get him now and repeated that "they" may have him under investigation. An unidentified male in the background said that "they" might be "building a case" on CRAFTON. STEWART then explained that the "Feds" are different than the police and that you may "serve" the "Feds" today or next week and they will

not "come till next year" to get you. (STEWART was explaining that, unlike local police, federal law enforcement authorities do not always immediately arrest an individual who they are aware sells narcotics but instead wait as they build a case against the individual.)

### STEWART, CRAFTON and HESTER

16. On December 11, 2007 at 9:18 p.m., CRAFTON called HESTER and told him that CRAFTON's "man" (an unidentified person looking to purchase narcotics) was coming through and wanted "4 piece" (a specific quantity of narcotics, likely 4 bricks of heroin). HESTER asked CRAFTON where the purchaser was and CRAFTON said he would call when "he" (the purchaser) was outside. HESTER asked what the "number" was. (HESTER was asking what price to charge). CRAFTON, not recognizing what HESTER asked, repeated "4 " (the quantity that the purchaser wanted). HESTER said no and said "2 and a quarter." (HESTER was asking if the price he should charge was $225 per brick of heroin.) CRAFTON said he did not care. Three minutes later, CRAFTON called HESTER and said "he" (the purchaser) was in a white Astro van and told HESTER to go outside. HESTER agreed.

17. On January 23, 2008, at 7:43 p.m, a coconspirator called STEWART and told him that he needed to see the "girls on 17th street." (As is made clear in subsequent calls, the coconspirator was requesting 17 bricks of heroin.) STEWART told the coconspirator to go see "homeboy" (as is made clear in subsequent calls, STEWART was telling the coconspirator to go see HESTER to purchase the requested heroin) and STEWART said he would call "him" (referring to HESTER) to tell him.

18. On January 23, 2008, at 7:47 p.m. STEWART called HESTER and told him that the coconspirator was going to swing through to see HESTER and that he needed "17 shirts." (STEWART was telling HESTER that the coconspirator was going to come see HESTER to purchase 17 bricks of heroin.) STEWART repeated that the coconspirator needed "17." HESTER asked STEWART how much STEWART had told the coconspirator. (HESTER was asking STEWART what price he should charge for the narcotics.) STEWART said "200 " ($200 per brick of heroin) and that HESTER should take "10 dollars" off each one. (Stewart was telling HESTER that his commission for selling the narcotics was $10 for each brick of heroin.)

### STEWART, CRAFTON and CO-CONSPIRATOR 3

19. On January 5, 2008, at 4:51 p.m., CRAFTON called co-conspirator 3 (hereinafter "CC-3"). During the call, CC-3 asked how much a "whole one" (likely a kilogram of cocaine) went for. CRAFTON said that he was not doing a "whole one." (CRAFTON was saying he did not have a kilogram of cocaine for sale.) CC-3 asked CRAFTON how much he had and CRAFTON replied "enough." CC-3 asked if CRAFTON had some "grams" and CC-3 said that he needed "240." (CC-3 was asking for 240 grams of cocaine.) CRAFTON said he could get CC-3 "some" and asked if CC-3 was ready "now" and whether CC-3 had the "money now." (CRAFTON was saying that he could provide the 240 grams of cocaine CC-3 requested and wanted to know if CC-3 had the money ready.) CC-3 asked how long it would take before CRAFTON could be at defendant STEWART's house. CRAFTON said he was ready at that moment. CC-3 asked CRAFTON to do the "140 " and the "100 " separate. (CC-3 was asking CRAFTON to package the 240 grams of cocaine in two separate amounts.) CRAFTON said it

was "26." (CRAFTON was telling CC-3 the price of the cocaine was $26 per gram.) CC-3 said all right and again asked CRAFTON to "do the 140 and the 100." CRAFTON agreed.

20. On January 5, 2008 at 6:32 p.m., CRAFTON called CC-3 and said that that "shit" was not right. (CRAFTON was saying that CC-3 had not given CRAFTON enough money for the cocaine that CRAFTON had supplied.) CC-3 asked what CRAFTON meant and CRAFTON asked CC-3 what the total was. CC-3 said it was "5,200 " for "200 " and "40 " times "26 ." (CC-3 was trying to calculate the price of the 240 grams of cocaine he purchased from CRAFTON for $26 per gram.) CRAFTON again said that "shit" was not right and asked how much was in that "shit." CC-3 said he would see what was up.

21. On January 5, 2008, at 6:39 p.m., CC-3 called CRAFTON. During the call, CRAFTON said that he had told CC-3 that the "shit" (narcotics proceeds) was not right. CC-3 said CRAFTON was right and that CC-3 was going to go collect it for him. (CC-3 agreed with CRAFTON that he had not provided enough money and said that he was going to get the missing amount for CRAFTON.) CRAFTON said there was "540 missing." (CC-3 had shorted CRAFTON $540.) CC-3 said that he was going to give it to CRAFTON.

22. On January 23, 2008, at 6:23 p.m., CC-3 called STEWART and told him that he wanted to purchase "that thing" which CC-3 later described as "meth man." (CC-3 was asking to purchase heroin that was packaged in envelopes stamped with the name "meth man.") STEWART said that he did not have any more "meth man" but that he had "welcome back" which he said was the same thing as "meth." (STEWART was saying that the only heroin he had left was in envelopes stamped with the name "welcome back" but that it was the same type of heroin as was in the "meth man" envelopes.) CC-3 said that "they" (CC-3's customers) wanted "more meth." STEWART said the last ones went the day before. (STEWART was saying he had sold the last heroin labeled "meth man" the day before.)

23. On January 23, 2008 at 6:52 p.m., CC-3 called STEWART and asked how long he was going to be and STEWART told CC-3 that he needed a couple of minutes and would call him when STEWART was about to pull up. (CC-3 apparently decided to purchase some of the heroin that STEWART had available and STEWART was on his way to deliver it to CC-3.)

24. On January 24, 2008, at 10:22 a.m., CC-3 called STEWART and told him that his customers were complaining about "that shit" (the heroin that STEWART had supplied the previous day that was labeled "welcome back.") STEWART asked what they (CC-3's customers) had said and CC-3 said that "it" (the heroin) was "garbage." STEWART said that it was the "same shit" that was in there. (STEWART was saying the heroin was the same as the "meth man" that STEWART had previously provided CC-3.) CC-3 said that he did not know, but repeated that "they" were complaining and that CC-3 asked STEWART to change the "shits" for his customers. (CC-3 was asking STEWART to switch the heroin he had provided for a different type.) Stewart agreed to do so.

25. On January 24, 2008 at 11:00 p.m., CC-3 called STEWART. During the call STEWART said he would take care of CC-3 first thing the next day. CC-3 asked if STEWART had gotten "it." (CC-3 was asking if STEWART had obtained more of the "meth man" heroin that his customers had requested.) STEWART said no but that he was going to give CC-3 his "paperwork" back. (STEWART was telling CC-3 that he did not have the "meth man" but he

would take back the heroin he had sold CC-3 and would return his money.) CC-3 told STEWART that he did not need to take the heroin back because CC-3 was going to get rid of "them" and make some "points" real fast. (CC-3 was saying that instead of returning the heroin to STEWART, he was going to sell it himself so he could make some quick money.) STEWART told CC-3 that his "homeboy" (CC-3's customer who complained about the heroin) was on some "bullshit." CC-3 agreed and said that he was a "name chaser." (CC-3 was referring to his customer as someone who is influenced by the "brand" name of heroin he purchases.) STEWART agreed that "they" were on the "name shit" and told CC-3 to tell "them" that "Frank Lucas is back bitch." (STEWART, clearly bothered that CC-3's clients complained about STEWART's heroin, was comparing himself to Frank Lucas, a notorious drug dealer who was recently depicted in a motion picture called American Gangster.)